AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means                    ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)* )<br>Black Samsung cell phone, with IMEI 5899769282 )<br>)<br>)<br>)<br>) | Case No. 8:23-MJ-00448-DUTY |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return</u> <u>through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for_____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of   _____.

Date and time issued:      <u>09/05/2023 at 3:14 PM</u>                    <u>/s/ Autumn D. Spaeth</u>
                                                                                                                *Judge's signature*

City and state:      <u>Santa Ana, California</u>              <u>Honorable Autumn D. Spaeth U.S. Magistrate Judge</u>
                                                                                                        *Printed name and title*

AUSA:      <u>M. Rabbani</u>

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

~~(Page 2)~~

| **Return** | | |
|---|---|---|
| Case No.:<br>8:23-MJ-00448-DUTY | Date and time warrant executed:<br>September 7, 2023 at 10am | Copy of warrant and inventory left with:<br>Mailed to Elmer GOMEZ VASQUEZ at 23861 Palmek Circle, Lake Forest, CA |

Inventory made in the presence of :
  HSI SA Tory Torres

Inventory of the property taken and name of any person(s) seized:
  All requested data from the Black Samsung cell phone.

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  10/12/23

TORY L TORRES

Digitally signed by TORY L TORRES
Date: 2023.10.12 10:31:24 -07'00'

_Executing officer's signature_

Tory Torres, Special Agent

_Printed name and title_

## **AFFIDAVIT**

I, Tory Torres, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.   I am a Special Agent ("SA") with the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), assigned to the Special Agent in Charge in Los Angeles, Office of the Assistant Special Agent in Charge, Orange County, California.  I have been so employed since January 2019.  As a part of my Special Agent training, I completed the Criminal Investigator Training Program and the HSI Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, in August 2019. As part of my daily duties as an HSI SA, I investigate, among other things, offenses related to the sexual exploitation of children and child pornography in the Central District of California as part of the HSI Orange County Child Exploitation Task Force ("OCCETF").  HSI's OCCETF is responsible for enforcing federal criminal statutes that prohibit the sexual exploitation of children under 18 U.S.C. § 2251, et seq.

2.   I have received training regarding the investigation of child pornography and child exploitation offenses, and am therefore familiar with numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including digital media. Specifically, I have completed Undercover Chat Training and am familiar with tactics used in the online enticement of minors to include utilization of

certain social media platforms and grooming practices. I have also participated in the execution of numerous search warrants, many of which were executed as part of investigations of child exploitation and child pornography offenses. Moreover, I am a federal law enforcement officer engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2422. and I am authorized by law to request a search warrant.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a search warrant for a black Samsung cell phone, IMEI 5899769282 (the "SUBJECT DEVICE"), currently in the possession of HSI, described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2422(b) (Enticement of a Minor) (the "SUBJECT OFFENSE").

4. The facts set forth in this affidavit are based upon my personal observations, my personal investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including investigators from the Orange County Sheriff's Department (OCSD) and Laguna Beach Police Department (LBPD). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance

and in part only, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    Along with other members of law enforcement, I have been investigating individuals who are communicating with minors and enticing them to meet in person and engage in illegal sexual activity.

6.    As set forth in greater detail below, using a decoy social media account, I began chatting online with an adult male, later identified Elmer GOMEZ VASQUEZ, who believed that I was a minor.  GOMEZ VASQUEZ asked me to meet him in person to have sex.  When GOMEZ VASQUEZ arrived at the designated meeting place, he had the SUBJECT DEVICE with him.

7.    Investigators confirmed that GOMEZ VASQUEZ was using the SUBJECT DEVICE in chatting with my decoy social media account.

8.    Individuals who attempt to entice minors to engage in illegal sexual activity frequently seek those minors out through social media and other applications on their phones, and then continue to chat with minors through social media and other applications.  Thus, as set forth more fully below, there is probable cause to believe that the SUBJECT DEVICE contains evidence of violations of 18 U.S.C. §§ 2422(b) (Enticement of a Minor).

### IV. <u>DEFINITIONS</u>

9.    The following definitions apply to this Affidavit and Attachment B.

10. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

11. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

12. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

13. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in

conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

14.  "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

15.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or

"booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

16.   "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

17.   "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

18.   "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

19.   "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

20.   "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

21.   "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

22.   "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

23.   "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## V.   **STATEMENT OF PROBABLE CAUSE**

24.   In July of 2023, the OCCETF, OCSD and LBPD partnered for Operation Online Guardian. This operation included creating decoy online personas depicting minor males and females for the purpose of attracting individuals attempting to contact and abuse minors.

25.   On July 10, 2023, I created a decoy profile on Meta/ Instagram depicting a minor female with the username 'gmalloy562.' The profile picture for the account was an age-regressed image of me, which was altered with the 'FaceApp'

Software. The image was altered to depict a minor female around
the age of 13.

26.  On July 11, 2023, I utilized the website 'Omegle.com'
in order to initiate chats with individuals online. Omegle is a
free chat website that allows users to socialize without
registering personal information. The service will pair chatters
randomly by common interests. I listed my interests as "Orange
County" and "Los Angeles" and was paired with several chatters
on this day. I gave the decoy Instagram account mentioned above
to several users during the course of these chats.

27.  On July 11, 2023, soon after chatting with individuals
on Omegle, the decoy Instagram account received a direct message
request from Instagram user 'Gomez E Vasquez' with username
'gomez1120e,' later identified as Elmer GOMEZ VASQUEZ (DOB
11/20/1996).

28.  On July 11, 2023, after I stated that I was 13 years
old, GOMEZ VASQUEZ initiated a sexual conversation and sent an
image of what appeared to be an adult penis. GOMEZ VASQUEZ also
sent a video of what appeared to be an adult male masturbating.
Shortly after, GOMEZ VASQUEZ asked to meet me in person. GOMEZ
VASQUEZ did not respond quickly enough that day for the OCCETF
to set up an operation to meet in person.

29.  On July 20, 2023, the OCCETF, OCSD, and LBPD conducted
a planned operation as a part of Operation Online Guardian. I
initiated a direct message conversation with GOMEZ VASQUEZ.
Shortly into the conversation GOMEZ VASQUEZ stated, "wanna
fuck." GOMEZ VASQUEZ offered to pick me up and sent an image of

blue Trojan condoms. I restated that I was 13 years old and gave
GOMEZ VASQUEZ my location as Lake Forest Sports Park (2800 Vista
Terrace, Lake Forest). GOMEZ VASQUEZ stated, "Ok but don't say
anything to your parents I don't want to have problems." GOMEZ
VASQUEZ sent an image of himself wearing a black t-shirt with
the words "California Pacific" on the front.

30.   At approximately 0930 hours, GOMEZ VASQUEZ informed me
that he had arrived at the park. OCSD Investigators and Deputies
contacted GOMEZ VASQUEZ inside of the driver's seat of a white
Toyota Camry (CA# 8HNN592) and detained him. GOMEZ VASQUEZ was
wearing the same shirt shown in the image he had sent me earlier
that day and was in possession of the SUBJECT DEVICE. There were
also two unopened blue Trojan condoms lying on the front right
passenger seat, which appeared to be the same condoms depicted
in the image that GOMEZ VASQUEZ sent to me at the decoy account.
GOMEZ VASQUEZ was placed in handcuffs and taken to the
Saddleback Substation to be interviewed.

31.   At approximately 1000 hours, OCSD Investigator J.
Arvizo and I interviewed GOMEZ VASQUEZ. GOMEZ VASQUEZ stated
that he preferred to speak Spanish, so Investigator Arvizo, who
is a certified Spanish speaker for OCSD, helped with
translation. Investigator Arvizo read GOMEZ VASQUEZ his Miranda
Rights in Spanish and he stated, "Si" (Yes), to the four
questions indicating he understood his rights. Investigator
Arvizo then asked GOMEZ VASQUEZ if he wanted to talk, and he
agreed.

32.   GOMEZ VASQUEZ stated he was having an online conversation with a female, but he did not know her age. I informed GOMEZ VASQUEZ that I was able to see the conversation he had with the female and knew that she told him she was 13 years old. GOMEZ VASQUEZ stated that she did not look underage on the picture she sent him. GOMEZ VASQUEZ stated that while communicating on "Omegle," the female had told him she was 18 years old. GOMEZ VASQUEZ stated that the female looked 18 years old or even older on the picture she had sent him. GOMEZ VASQUEZ stated he had also listened to a voicemail the female left him, and her voice sounded that of an older person.

33.   GOMEZ VASQUEZ admitted that the female later told him she was 13 years old and that he was aware of her age before they arranged to meet today. GOMEZ VASQUEZ admitted to telling the female not to tell her parents about the meet so she would not get in trouble.

34.   GOMEZ VASQUEZ admitted to sending the female a picture of male genitals but stated that they were not his. He had downloaded the image from the internet and sent it to her. GOMEZ VASQUEZ admitted to sending the female a picture of the condoms and asking her if she wanted to "fuck." He said that the female then sent him the location on where to meet her. GOMEZ VASQUEZ stated that after meeting the female, his plan was to get to know her, and then have her decide what was going to happen next.

35.   GOMEZ VASQUEZ stated he has never done this before, and this was his first time trying to meet with a minor. GOMEZ

10

VASQUEZ denied communicating with any other minors online prior to this incident. GOMEZ VASQUEZ denied having a sexual interest in minors and denied having Child Sexual Abuse Material (CSAM) in his possession or ever viewing it.

36.   GOMEZ VASQUEZ was asked about the condoms, and he stated that he always carries condoms in his vehicle. GOMEZ VASQUEZ stated that he is aware that it is illegal to send pictures of male genitals to a minor and to have sexual intercourse with a minor.

37.   GOMEZ VASQUEZ gave the passcode to the SUBJECT DEVICE, and I seized the device as evidence. The condoms were also taken as evidence by OCSD.

38.   GOMEZ VASQUEZ was advised that he was under arrest for violation of California Penal Code Section 288.3(A) (Contact/Communicate with Minor) and California Penal Code Section 288.4(A)(1) (Arrange to Meet with a Minor) and was taken to the Intake and Release Center jail.

## VI. TRAINING AND EXPERIENCE ON INDIVIDUALS ATTEMPTING TO ENTICE MINORS TO ENGAGE IN ILLEGAL SEXUAL ACTIVITY

39.   Through my training and experience, I have become familiar with the methods of operation used by people who are involved with the offenses involving the sexual exploitation of children. I attended the Homeland Security Investigations Undercover Chat Training where I learned how individuals utilize the internet and social media, either through chat functions or direct messaging, to entice minors to engage in illegal sexual activity.

40.    These individuals commonly initiate a sexual conversation online with the minor, including but not limited to:

        a.    Asking the minor about past sexual experiences,

        b.    Sending images and videos depicting sexual activities to desensitize the minor, and

        c.    Instructing the minor to send them images and videos of themselves and/or child pornography, as defined in 18 U.S.C. § 2256(8).

41.    After the sexual conversation progresses, these individuals will often ask the minor to meet in person for the purposes of illegal sexual activity. These individuals often instruct the minor to keep the meet up a secret from their parents out of fear that they will be caught.

42.    Once these individuals feel that they have the trust of the minor, they will commonly go to an agreed upon site to meet with the minor for purposes of illegal sexual activity. These individuals will also commonly bring items such as condoms, alcohol, or lingerie to aid in the illegal sexual activity. These individuals are almost always in possession of the cellular device that they have been communicating with the minor on at the arrival to the meet site.

43.    These individuals commonly correspond with multiple minors at one time.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

44.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

     c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Elmer GOMEZ VASQUEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Elmer GOMEZ VASQUEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

47. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    <u>CONCLUSION</u>

48. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which

//

constitute evidence, fruits, and instrumentalities of the

SUBJECT OFFENSES, will be found on the SUBJECT DEVICE, as

described in Attachment A.

/s/ Tory Torres
_____
TORY TORRES, Special Agent
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  5  day of
September, 2023.


____/s/ Autumn D. Spaeth_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

<u>PREMISES TO BE SEARCHED</u>

Black Samsung cell phone, with IMEI 5899769282, found in Elmer
GOMEZ VASQUEZ's vehicle at the time of arrest. Currently held at
Homeland Security Investigations Evidence Room located at 34
Civic Center Plaza, 4th Floor, Santa Ana CA under the seizure
number 2023270500011801-001.

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2422(b) (Enticement of a Minor), namely:

a.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to online conversations with minors to include chatroom conversations, social media application direct messages, screenshots of minor's social media profiles, images sent to or received from minors online.

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to peer-to-peer file-sharing software.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT DEVICE.

e.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSE, and forensic copies thereof.

       f.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

           i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

           ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

           iii. evidence of the attachment of other devices;

           iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

           v.   evidence of the times the device was used;

           vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

           vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

v

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the
device has expired) absent further court order.

g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.   After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

5.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

6.   During the execution of this search warrant, law
enforcement is permitted to: (1) depress Elmer GOMEZVASQUEZ's
thumb and/or fingers onto the fingerprint sensor of the device
(only when the device has such a sensor), and direct which
specific finger(s) and/or thumb(s) shall be depressed; and (2)

hold the device in front of Elmer GOMEZVASQUEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.